COMMONWEALTH *vs.* KEMPESS SYLVAIN.

Suffolk. May 6, 2013. - September 13, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Controlled Substances. Alien. Constitutional Law,* Plea, Assistance of counsel, Retroactivity of judicial holding. *Due Process of Law,* Plea, Assistance of counsel. *Practice, Criminal,* Plea, Assistance of counsel, Retroactivity of judicial holding.

This court concluded that, under its authority as provided in *Danforth* v. *Minnesota,* 552 U.S. 264 (2008), it would continue to adhere to the construction of the United States Supreme Court that a case announces a "new" rule only when the result is not dictated by precedent, and declined to incorporate the Supreme Court's broadened formulation of that test in decisions subsequent to *Padilla* v. *Kentucky,* 130 S. Ct. 1473 (2010); further, this court concluded that, as a matter of State law, for purposes of retroactive application, the *Padilla* decision (holding that a criminal defendant has a right under the Sixth Amendment to the United States Constitution to accurate advice from counsel as to the deportation consequences of a guilty plea) did not announce a "new" constitutional rule of criminal procedure, and therefore, a noncitizen criminal defendant who received erroneous advice regarding the deportation consequences of a guilty plea or of being convicted at trial, and whose conviction was final at the time the *Padilla* decision was decided, was entitled to seek relief under the Sixth Amendment right recognized in that decision [427-436], as well as under art. 12 of the Massachusetts Declaration of Rights [436-437].

The record in a criminal matter did not permit this court to determine whether a noncitizen criminal defendant received ineffective assistance of counsel when the attorney erroneously advised the defendant that his plea of guilty to a charge of possession of a controlled substance, for which the defendant was sentenced to eleven months in a house of correction, was not likely to result in the defendant's deportation. [437-439]

COMPLAINT received and sworn to in the Dorchester Division of the Boston Municipal Court Department on April 17, 2007.

A motion to vacate, filed on January 12, 2012, was heard by *James W. Coffey,* J., and a motion to reconsider was considered by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Wendy S. Wayne*, Committee for Public Counsel Services (*Laura Mannion Banwarth* with her) for the defendant.

*Cailin M. Campbell*, Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Christopher N. Lasch*, of Colorado, for Massachusetts Legal Academics.

*Sejal Zota*, of North Carolina, & *Paromita Shah, Todd C. Pomerleau, & Sarah Unger* for National Immigration Project of the National Lawyers Guild & others.

*David M. Siegel* for David M. Siegel & another.

CORDY, J. In 2007, the defendant, Kempess Sylvain, a noncitizen lawfully residing in the United States, pleaded guilty to possession of a controlled substance, subjecting him to automatic deportation from the United States. After the defendant's conviction was final, we decided *Commonwealth* v. *Clarke*, 460 Mass. 30, 34, 37, 45 (2011) (*Clarke*), which held that the rule announced in *Padilla* v. *Kentucky*, 559 U.S. 356, 366, 373-374 (2010) (*Padilla*), regarding a criminal defendant's right under the Sixth Amendment to the United States Constitution to accurate advice as to the deportation consequences of a guilty plea, was not a "new" rule under *Teague* v. *Lane*, 489 U.S. 288, 301, 310 (1989) (*Teague*), and therefore applied retroactively to cases on collateral review. Thereafter, the defendant filed a motion for a new trial seeking to vacate his guilty plea on the ground that his attorney was constitutionally deficient in erroneously advising him that there would be no deportation consequences stemming from his guilty plea. The defendant's motion was denied, and he timely appealed. While the defendant's appeal was pending, the United States Supreme Court decided *Chaidez* v. *United States*, 133 S. Ct. 1103, 1105, 1111 (2013) (*Chaidez*), which held that *Padilla* did announce a "new" rule under *Teague* and, thus, does not apply retroactively to collateral challenges under Federal law. We granted the defendant's application for direct appellate review to consider whether we should continue to give *Padilla* retroactive effect in light of *Chaidez*.

We conclude, as a matter of Massachusetts law and consistent

with our authority as provided in *Danforth* v. *Minnesota*, 552 U.S. 264, 282 (2008) (*Danforth*), that the Sixth Amendment right enunciated in *Padilla* was not a "new" rule and, consequently, defendants whose State law convictions were final after April 1, 1997, may attack their convictions collaterally on *Padilla* grounds. We thus affirm our decision in *Clarke*. We further conclude that under art. 12 of the Massachusetts Declaration of Rights, defense counsel has a duty to provide noncitizen defendants with accurate advice regarding the deportation consequences of pleading guilty or being convicted at trial and that this right also applies retroactively to cases on collateral review.

Having decided that the defendant may seek relief under the Sixth Amendment and art. 12, we conclude that although the defendant's counsel's erroneous advice may have been constitutionally inadequate, without additional findings we are unable to determine whether the defendant was sufficiently prejudiced to warrant vacating his guilty plea and ordering a new trial. Consequently, we remand the case to the Boston Municipal Court judge for further findings and proceedings consistent with this opinion.[1]

*Background.* The material facts are not in dispute. On the morning of April 15, 2007, a Boston police officer patrolling along Blue Hill Avenue in the Dorchester section of Boston witnessed the defendant engaging in a sexual act with a prostitute. As the officer approached, the defendant removed several small plastic baggies from his coat pocket and placed them in his mouth. Believing that the baggies contained "crack" cocaine and fearing that the defendant might overdose, the officer attempted to intercede. Although the defendant ingested the drugs, a subsequent search of his jacket revealed an additional baggie of "crack" cocaine. The incident took place within 1,000 feet of a child care center.

Following his arrest, the defendant was charged with one

---

[1]We acknowledge the amicus briefs of Massachusetts Legal Academics; National Immigration Project of the National Lawyers Guild, Boston College Post-Deportation Human Rights Project, Massachusetts Association of Criminal Defense Lawyers, Harvard Immigration and Refugee Clinical Program, Massachusetts Law Reform Institute, and Political Asylum/Immigration Representation Project; and David M. Siegel and Lawrence M. Friedman.

count of possession of cocaine with the intent to distribute, G. L. c. 94C, § 32A (a); and one count of a drug violation in a school zone, G. L. c. 94C, § 32J. The latter charge carried a minimum mandatory sentence of two years' imprisonment. In exchange for the dismissal of the school zone and distribution related charges, the defendant pleaded guilty to simple possession of cocaine, G. L. c. 94C, § 34, and was sentenced to eleven months in a house of correction suspended for two years. The defendant's conviction became final on October 2, 2007.[2]

In January, 2012, the defendant filed a motion to vacate his guilty plea pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). Citing Padilla, supra, and Clarke, supra, the defendant contended that, as a noncitizen, "he was denied effective assistance of counsel when his trial counsel failed to advise him of the immigration consequences that could result from his guilty plea" and, therefore, the "plea was obtained in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights."[3]

In support of his motion, the defendant submitted an affidavit of his counsel averring that, "At the time I represented [the

---

[2]As part of his guilty plea, the defendant signed a form, Section II of which included a "Waiver of Rights" and an "Alien Rights" notice. By signing Section II of the form, the defendant acknowledged, "I understand that if I am not a citizen of the United States, conviction of or admission to this offense may result in deportation . . . pursuant to the laws of the United States." Under Section III of the same form, the defendant's counsel certified, "I have explained to the defendant the legal rights and consequences referred to in Section II above." Under Section IV, the Boston Municipal Court judge separately certified that "the defendant has knowingly, intelligently, and voluntarily waived all of the rights as explained during these proceedings and as set forth in this form" and that "the defendant was informed and advised that if he or she is not a citizen of the United States, a conviction of or admission to the offense(s) with which the defendant was charged may have the consequence[] of deportation . . . pursuant to the laws of the United States." We have held that "the receipt of such warnings is not an adequate substitute for defense counsel's professional obligation to advise [his] client of the likelihood of specific and dire immigration consequences that might arise from such a plea." Commonwealth v. Clarke, 460 Mass. 30, 48 n.20 (2011) (Clarke).

[3]According to the defendant's affidavit in support of his motion for a new trial, his current attorney has informed him that United States Immigrations and Customs Enforcement has contacted the District Court Department of the Trial Court and requested information concerning his conviction. However, removal proceedings have not yet been instituted.

defendant], I was aware that he was not a citizen of the United States [and] I advised [the defendant] . . . that this disposition was not likely to result in his deportation because it was a conviction for straight [p]ossession with a sentence of under a year." The defendant also filed his own affidavit stating that, but for his counsel's erroneous advice, "I would not have agreed to plead guilty to something that would surely result in my deportation." The motion judge denied, without written findings, both the defendant's motion to vacate and his subsequent motion for reconsideration. The defendant appealed, and during the pendency of the appeal, the Supreme Court decided *Chaidez*. The defendant then filed an application for direct appellate review, which we granted.

*Discussion.* The defendant urges us to continue to apply *Padilla* retroactively, despite the Supreme Court's decision in *Chaidez*. In particular, he contends that *Danforth*, *supra* at 282, allows us to continue to apply the retroactivity framework from *Teague*, *supra*, but nevertheless reach a divergent conclusion from *Chaidez*. Specifically, he asserts that despite the Supreme Court's conclusion in *Chaidez* that *Padilla* announced a "new" rule, we are free to arrive at the opposite conclusion as a matter of State law and, by doing so, provide greater protection for defendants challenging their convictions on collateral review. Alternatively, the defendant urges us to recognize a remedy under art. 12 that parallels the Sixth Amendment right enunciated in *Padilla*.[4]

The Commonwealth responds by construing the defendant's argument about the retroactivity of the Sixth Amendment right

---

[4]The defendant also argues that with respect to persons who have pleaded guilty, because relief under *Padilla* v. *Kentucky*, 559 U.S. 356 (2010) (*Padilla*), may only be sought by defendants pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), such claims for relief should be treated as direct review, making retroactivity analysis inapplicable. We reject this argument. Finally, the defendant contends that the case of *Chaidez* v. *United States*, 133 S. Ct. 1103 (2013) (*Chaidez*) "did not erode the retroactive application of a defendant's Sixth Amendment right not to be affirmatively misadvised regarding the immigration consequences of his conviction." Because the Supreme Court in *Padilla*, *supra* at 370, declined to distinguish "between an act of commission and an act of omission," we also decline to draw a distinction between affirmative misadvice and a failure to advise for the purposes of the ineffective assistance of counsel under the Sixth Amendment and art. 12.

in *Padilla* as attempting to discard our State law version of the *Teague* framework and replace it with an undefined alternative. Although the Commonwealth acknowledges our authority to depart from the Supreme Court on this issue based on its decision in *Danforth*, the Commonwealth maintains that doing so ignores that prior to *Padilla*, criminal defense attorneys had no obligation to advise their clients of the immigration consequences of a guilty plea. The Commonwealth further contends that there is no basis for interpreting art. 12 as providing a right to accurate advice from counsel regarding the deportation consequences of a guilty plea that would apply retroactively to cases on collateral review.

1. *Retroactivity.* a. *Sixth Amendment right to effective assistance of counsel following* Padilla. In *Padilla, supra* at 374, the United States Supreme Court held that the Sixth Amendment requires a criminal defense attorney to provide accurate advice regarding the deportation consequences arising from a guilty plea. According to the Court, failure to provide such advice is a "constitutional deficiency" that satisfies the first prong of the test for ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668 (1984) (*Strickland*).[5] *Padilla, supra* at 369. The Court did not explicitly state whether *Padilla* would apply retroactively to cases on collateral review.

---

[5]To prove ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 687 (1984) (*Strickland*), the defendant must make a two-part showing:

"First, the defendant must show that counsel's performance was deficient [which] requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense [which] requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

As it relates to the first prong, the United States Supreme Court has explained that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland, supra* at 688. The *Strickland* test for ineffective assistance of counsel tracks the Massachusetts test, which asks (1) whether there has been "behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer" and (2) "whether it has likely deprived the defendant of an otherwise available substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). We have held that satisfying the *Saferian* standard neces-

Thereafter, in *Clarke, supra* at 45, we were required to confront whether the Federal constitutional right recognized in *Padilla* applied retroactively to criminal convictions that were final at the time *Padilla* was decided. In our decision, we relied on the analytical framework set forth in *Teague, supra* at 310, which we adopted in *Commonwealth v. Bray,* 407 Mass. 296, 300-301 (1990) (*Bray*). Under *Teague* and its progeny, although "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced," *id.*, "old rule[s] appl[y] both on direct and collateral review." *Whorton v. Bockting,* 549 U.S. 406, 416 (2007).[6] As this framework suggests, the determination whether a case announces a "new" rule is at the heart of the retroactivity analysis. According to the Supreme Court in *Teague, supra* at 301, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government [or] if the result was not *dictated* by precedent existing at the time the defendant's conviction became final" (emphasis in original). Subsequent decisions of the Supreme Court have opined that a rule is "dictated by precedent" if the result was "apparent to *all* reasonable jurists" at the time the defendant's conviction became final (emphasis added). *Chaidez, supra* at 1107, quoting *Lambrix v. Singletary,* 520 U.S. 518, 527-528 (1997). Thus, a case announces a "new" rule if the result was *not* apparent to all reasonable jurists at the time the defendant's conviction became final. See, e.g., *Graham v. Collins,* 506 U.S. 461, 477 (1993) ("determinative question is whether reasonable jurists reading the case law that existed in 1984 could have concluded that [defendant's] sentencing was *not* constitutionally infirm" [emphasis in original]); *Wright v. West,* 505 U.S. 277, 304 (1992) (O'Connor, J., concurring) ("new rule inquiry [asks] whether 'reasonable

---

sarily satisfies the *Strickland* standard. *Commonwealth v. Fuller,* 394 Mass. 251, 256 n.3 (1985).

[6]There are only "two exceptions to [this] general rule of nonretroactivity for cases on collateral review. First a new rule should be applied retroactively if it places 'certain kinds of primary, private conduct beyond the power of the criminal law-making authority to proscribe.' . . . Second, a new rule should be applied retroactively if it requires the observance of 'those procedures that . . . are "implicit in the concept of ordered liberty." ' " *Teague v. Lane,* 489 U.S. 288, 307 (1989) (*Teague*), quoting *Mackey v. United States,* 401 U.S. 667, 692, 693 (1971) (Harlan, J., concurring).

jurists' could disagree as to whether a result is dictated by precedent"); *Sawyer* v. *Smith*, 497 U.S. 227, 234 (1990) (*"Teague* serves to ensure that gradual developments in law over which reasonable jurists may disagree are not later used to upset finality of [S]tate convictions valid when entered"); *Butler* v. *McKellar*, 494 U.S. 407, 415 (1990) (constitutional rule that is "susceptible to debate among reasonable minds" qualifies as new rule).

In *Clarke*, we concluded that "[t]here is no question that the holding in *Padilla* is an extension of the rule in *Strickland*," *Clarke, supra* at 37, and that *Padilla* is the "definitive application of an established constitutional standard on a case-by-case basis, incorporating evolving professional norms[7] (on which the standard relies) to new facts." *Clarke, supra* at 43. This determination reflected our recognition that the standard for measuring ineffective assistance of counsel under *Strickland* is one of general applicability, designed to evaluate the reasonableness of an attorney's acts or omissions in a multitude of factual contexts. *Clarke, supra* at 36, 38-39, 43. See *Williams* v. *Taylor*, 529 U.S. 362, 390-391 (2000). Because application of such a general standard to a particular factual scenario rarely produces a new rule, *Clarke, supra* at 36, quoting *Wright* v. *West*, 505 U.S. 277, 308-309 (1992) (Kennedy, J., concurring), we concluded that *Padilla* did *not* announce a new rule and, thus, that the Sixth Amendment right enunciated in *Padilla* applied retroactively to cases on collateral review under the *Teague* framework.[8,9] *Clarke, supra* at 45.

---

[7]As it relates to those norms, we agreed with the Supreme Court's observation in *Padilla, supra* at 372, that for "at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea." See *Clarke, supra* at 43 n.15 ("since 1988, [the Committee for Public Counsel Services] has required all staff attorneys and bar advocates in Massachusetts to advise a defendant client of the immigration consequences of his or her criminal case").

[8]Stated differently, the effect of our decision was to permit defendants whose convictions became final after April 1, 1997, to collaterally challenge their guilty pleas in a motion for new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), based on their counsel's failure under the Sixth Amendment accurately to advise them of the deportation consequences of pleading guilty.

[9]We note that the decision in *Padilla* came as the result of a postconviction collateral attack by Padilla on his guilty plea. *Padilla, supra* at 359-360.

Our decision in *Clarke* was soon cast into doubt by the United States Supreme Court's decision in *Chaidez*.[10],[11] The Supreme Court's decision began by acknowledging, as we did in *Clarke*, *supra* at 36, 38-39, 43, that " 'where the beginning point' of our analysis is a rule of 'general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.' " *Chaidez*, *supra* at 1107, quoting *Wright* v. *West*, *supra* at 309 (Kennedy, J., concurring). For this reason, the Court conceded that "garden-variety applications of the test in [*Strickland*] for assessing claims of ineffective assistance of counsel do not produce new rules." *Chaidez*, *supra*.

However, according to the Court, *Padilla* "did something more" than "merely [make] clear that a lawyer who neglects to inform a client about the risk of deportation is professionally incompetent." *Chaidez*, *supra* at 1108. Specifically, *Padilla* considered the unsettled preliminary question whether "advice about deportation [was] 'categorically removed' from the scope of the Sixth Amendment right to counsel because it involved only a 'collateral consequence' of a conviction, rather than a component of the criminal sentence."[12] *Chaidez*, *supra*, quoting *Padilla*, *supra* at 1482. According to the Court, prior to *Padilla*,

[10]In *Chaidez*, *supra* at 1105-1106, the defendant, a lawful permanent resident of the United States, pleaded guilty to two counts of mail fraud. Her conviction became final in 2004. *Id.* at 1106. Under Federal immigration law, the offenses to which the defendant pleaded guilty subjected her to mandatory deportation, a fact that the defendant claimed her attorney had not made her aware of prior to her guilty plea. *Id.* Following the initiation of removal proceedings in 2009, the defendant filed a petition in Federal District Court, arguing that "her former attorney's failure to advise her of the immigration consequences of pleading guilty constituted ineffective assistance of counsel under the Sixth Amendment." *Id.* While the defendant's petition was pending, the Supreme Court decided *Padilla*, *supra*.

[11]The Federal District Court had concluded that *Padilla* did not announce a new rule for *Teague* purposes and therefore should apply to the defendant's case. See *Chaidez*, *supra* at 1106. The United States Court of Appeals for the Seventh Circuit reversed the District Court, see *id.*, and the Supreme Court granted certiorari "to resolve a split among [F]ederal and [S]tate courts on whether *Padilla* applies retroactively." *Chaidez*, *supra* at 1107.

[12]In other words, "[b]efore asking whether the performance of Padilla's attorney was deficient under *Strickland*, [the Court] considered . . . whether *Strickland* applied at all." *Chaidez*, *supra* at 1110.

the State and lower Federal courts had "almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation." *Chaidez, supra* at 1109. See *id.* at 1109 nn.7-8 (collecting cases).[13] Consequently, the Court reasoned that insofar as *Padilla, supra* at 366, concluded that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel," the decision altered the law of most jurisdictions and, therefore, represented a "new" rule under *Teague. Chaidez, supra* at 1110-1111. Accordingly, *Padilla* did not apply retroactively, a conclusion that is plainly at odds with our decision in *Clarke.*

The decision in *Chaidez* was not unanimous. Justice Sotomayor, with whom Justice Ginsburg joined, penned a dissenting opinion that took an entirely different view of the interrelationship between the *Strickland* standard and the Court's decision in *Padilla,* one more akin to our reasoning in *Clarke.* The dissent began by pointing out that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Chaidez, supra* at 1114 (Sotomayor, J., dissenting), quoting *Strickland, supra* at 688. Moreover, the reasonableness prong "takes its content from the standards by which lawyers judge their professional obligations . . . and those standards are subject to change." *Chaidez, supra* at 1114 (Sotomayor, J., dissenting), citing *Strickland, supra.* For this reason, in *Padilla,* the Court's application of *Strickland* "followed naturally" from the "changes in immigration law and the accompanying evolution of professional norms" over the previous fifteen years. *Chaidez, supra* at 1116 (Sotomayor, J., dissenting).

---

[13]In support of its assertion, the Supreme Court cited *Commonwealth* v. *Fraire,* 55 Mass. App. Ct. 916 (2002), a case decided prior to both *Padilla* and *Clarke.* See *Chaidez, supra* at 1109 n.8. In that case, the Appeals Court held that counsel was not ineffective "[b]ecause immigration consequences remain collateral in nature, [and] the defendant was not entitled to any [immigration] warning beyond that mandated by G. L. c. 278, § 29D." *Commonwealth* v. *Fraire, supra* at 918. The *Fraire* case was a rescript decision of the Appeals Court. It did not rely on precedent regarding the right to effective assistance of counsel. No petition for further appellate review was filed in the case. We have recently underscored that "characterizations of immigration consequences as 'collateral' are no longer good law." *Commonwealth* v. *Marinho,* 464 Mass. 115, 125 n.14 (2013).

According to the dissent, *Padilla* reached the result that it did "because those norms reflected changes in immigration law . . . , not because the Sixth Amendment right had changed at all." *Chaidez, supra* at 1117 (Sotomayor, J., dissenting). Thus, in the same way that we concluded in *Clarke, supra,* that application of a general standard designed to apply to varying factual scenarios does not engender a new legal rule, the dissent in *Chaidez, supra* at 1115, agreed that "where we merely apply *Strickland* in a way that corresponds to an evolution in professional norms, we make no new law."

b. *Application of* Padilla *in Massachusetts following* Chaidez. In *Clarke, supra* at 45, our analysis was concerned solely with the question whether, in the absence of Supreme Court guidance, the Sixth Amendment right to effective assistance of counsel, as explicated in *Padilla,* applied retroactively to cases on collateral review. We did not consider whether the right to the effective assistance of counsel under art. 12 also included the right to accurate advice from counsel concerning the deportation consequences of pleading guilty, or whether such a right might apply retroactively. Because the defendant raises claims under both the Sixth Amendment and art. 12, we address both avenues of potential relief.

i. *Retroactivity of the Sixth Amendment right to effective assistance of counsel under Massachusetts law.* Given that the Supreme Court's holding in *Chaidez* is plainly at odds with our decision in *Clarke,* the question is whether we may give broader retroactive effect to *Padilla* as a matter of State law than it would otherwise enjoy under Federal law.[14] We conclude that we may.

As discussed above, the Supreme Court's test for retroactivity is set forth in *Teague, supra* at 307, and its progeny.[15] The

---

[14]In *Clarke, supra* at 34 n.7, we were able to avoid this question because we concluded that "*Padilla* is retroactive even under *Teague.*" Given that that conclusion was rejected in *Chaidez,* we must address the issue today.

[15]Prior to *Teague,* the Supreme Court's retroactivity test was set forth in *Linkletter* v. *Walker,* 381 U.S. 618 (1965). Under the *Linkletter* case, retroactivity was "determined on a case-by-case basis by examining the purpose of the rule, the reliance of the States on the prior law, and the effect on the administration of justice of retroactive application of the rule." *Danforth* v. *Minnesota,* 552 U.S. 264, 273 (2008) (*Danforth*), citing *Linkletter* v. *Walker, supra* at 629.

*Teague* analysis is based on two primary policy considerations: comity and finality.[16] *Danforth, supra* at 279-280; *Teague, supra* at 306. The benefit of *Teague* is that it provides a "bright line rule on the issue of when relief is to be retroactive." *Danforth* v. *State*, 761 N.W.2d 493, 499 (Minn. 2009). In view of our concern that the finality of convictions not be unduly disturbed and our desire to have a clearly defined retroactivity standard, we adopted the *Teague* framework in *Bray, supra* at 300-301. Under the *Teague-Bray* framework, we first determine whether a rule is "new" or "old." See *Teague, supra* at 301; *Bray, supra.* If a rule is "new," it applies only to defendants whose cases are not final unless two narrow exceptions apply;[17] if a rule is "old," it also applies retroactively to defendants whose cases were final at the time the rule was announced. *Whorton* v. *Bockting*, 549 U.S. 406, 416 (2007).

Although we consider the retroactivity framework established in *Teague* to be sound in principle, the Supreme Court's post-*Teague* expansion of what qualifies as a "new" rule has become so broad that "decisions defining a constitutional safeguard rarely merit application on collateral review." *Colwell* v. *State*, 118 Nev. 807, 818, cert. denied, 540 U.S. 981 (2003). As discussed above, according to the original formulation discussed in *Teague, supra* at 301, "a case announce[d] a new rule if the result was not dictated by precedent" at the time the defendant's conviction became final. In its subsequent jurisprudence, however, the Supreme Court has greatly expanded the meaning of what is "new" to include results not "apparent to all reasonable jurists" at the time. *Lambrix* v. *Singletary*, 520 U.S. 518, 527-528 (1997).

Although we adopted the *Teague* retroactivity framework in *Bray, supra*, including the Court's original construction of what constitutes a "new" rule, we have not specifically considered whether we ought to incorporate the Supreme Court's broadened

---

[16]Comity refers to the Supreme Court's policy against excessive interference by Federal habeas courts in State criminal convictions that had become final. See *Danforth, supra* at 279-280; *Teague, supra* at 306. Finality refers to the need to bring criminal cases to a close. *Danforth, supra; Teague, supra.* The need to prevent excessive interference by Federal habeas courts has little application to collateral review by State courts themselves.

[17]See note 6, *supra.*

formulation of that test into our own definition of what constitutes a "new" rule under *Bray*. See *Commonwealth* v. *Melendez-Diaz*, 460 Mass. 238, 247-248 (2011) (declining to consider whether, as matter of State law, broader retroactive effect may be given to Federal constitutional rule and instead deciding that *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 311 [2009], announced new rule based on Federal retroactivity standard set forth in *Teague* and its progeny). We conclude that we should not adopt this expansion. Rather, we continue to adhere to the Supreme Court's original construction that a case announces a "new" rule only when the result is "not dictated by precedent." Our ability to adopt this narrower interpretation, and thereby expand the availability of remedies for violations of Federal constitutional rights, is specifically permitted by the Supreme Court's decision in *Danforth*.

In *Danforth*, *supra* at 266, the Supreme Court considered whether the retroactivity analysis of *Teague* "constrains the authority of [S]tate courts to give broader effect to new rules of criminal procedure than is required by that opinion."[18] Drawing on the "general principle that States are independent sovereigns with plenary authority to make and enforce their own laws as long as they do not infringe on the [F]ederal constitutional guarantees," *Danforth*, *supra* at 280, the Court concluded that "considerations of comity militate in favor of allowing [S]tate courts to grant [collateral] relief to a broader class of individuals than is required by *Teague*." *Id.* at 279-280. According to the Court, the "finality of [S]tate convictions . . . is a matter that States should be free to evaluate, and weigh the importance of, when prisoners held in [S]tate custody are seeking a remedy for a violation of [F]ederal rights by their lower courts." *Danforth*, *supra* at 280.

In this manner, the Court drew an important distinction between the existence of a Federal substantive right or remedy, the contours of which are fixed by Federal law, and the procedural availability of such a right, the scope of which may be set by State law. See *Danforth*, *supra* ("Any State could surely have

---

[18]Read in context, the Supreme Court's reference to "new rules of criminal procedure" refers to rules that are "new" under the *Federal* retroactivity analysis in *Teague*, *supra* at 307.

adopted the rule of evidence defined in *Crawford* [v. *Washington*, 541 U.S. 36 (2004),] under [S]tate law even if that case had never been decided. It should be equally free to give its citizens the benefit of our rule in any fashion that does not offend [F]ederal law"); *id* at 289 ("States that give broader retroactive effect to this Court's new rules of criminal procedure do not do so by misconstruing the [F]ederal *Teague* standard. Rather they have developed *[S]tate* law to govern retroactivity in [S]tate postconviction proceedings"). The Supreme Court concluded that *Teague* does not "limit the authority of a [S]tate court, when reviewing its own [S]tate criminal convictions, to provide a remedy for a violation that is deemed 'nonretroactive' under *Teague.*" *Danforth, supra* at 282.

As it pertains here, *Chaidez* concluded that *Padilla* announced a "new" rule under *Teague*. However, based on our authority to conduct an independent review, "[we] are not required to blindly follow that court's view of what constitutes a new rule." *Rhoades* v. *State*, 149 Idaho 130, 139 (2010), cert. denied, 131 S. Ct. 1571 (2011). Instead, we reserve our prerogative to define and determine within the *Bray* framework whether a rule is "new." The Supreme Courts of other States have come to the same conclusion. See *State* v. *Smart*, 202 P.3d 1130, 1138-1140 (Alaska 2009); *Rhoades* v. *State*, *supra*; *Danforth* v. *State*, *supra* at 500; *Colwell* v. *State*, *supra*.

We conclude that *Padilla* did not announce a "new" rule for the purposes of our retroactivity test under *Bray*. Our opinion is informed in part by our continued adherence to our analysis in *Clarke* and Justice Sotomayor's dissent in *Chaidez*. In brief, *Padilla* did not announce a "new" rule for the simple reason that it applied a general standard — designed to change according to the evolution of existing professional norms — to a specific factual situation. See *Clarke*, *supra* at 36, 38-39, 43; *Chaidez*, *supra* at 1114-1116 (Sotomayor, J., dissenting). We also are not persuaded that Massachusetts precedent at the time *Padilla* was decided would have dictated an outcome contrary to that in *Padilla*. Indeed, long before *Padilla* was decided, it was customary for practitioners in Massachusetts to warn their clients of the possible deportation consequences of pleading guilty. See *Clarke*, *supra* at 43 n.15. See also *Padilla*, *supra* at 372.

Because we conclude that under our State retroactivity analysis *Padilla* did not announce a "new" rule, the defendant, whose conviction was final at the time *Padilla* was decided, is entitled to seek relief under the Sixth Amendment right recognized in *Padilla*.

ii. *Article 12.* The defendant also contends that his attorney's erroneous advice constituted ineffective assistance of counsel under art. 12. We have not *expressly* stated that art. 12 demands that defense counsel provide defendants with accurate advice concerning the deportation consequences of a guilty plea or conviction at trial. That such a right exists, however, is implicit in our recent decision in *Commonwealth* v. *Marinho*, 464 Mass. 115 (2013) (*Marinho*).

In *Marinho*, *supra* at 122, we considered whether defense counsel's failure accurately to advise the defendant of the potential immigration consequences of a *conviction at trial* constituted ineffective assistance of counsel under the Sixth Amendment and art. 12. In light of *Padilla*'s broad language and the prevailing "expectation[s] in the Massachusetts legal community," we concluded that "defense counsel [has] a duty to inform a noncitizen client that conviction, whether by plea or by trial, may carry adverse immigration consequences." *Marinho*, *supra* at 125. We further determined that failure to provide such advice constitutes behavior that falls "measurably below that which might be expected from an ordinary fallible lawyer." *Marinho*, *supra* at 126, quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974) (*Saferian*).

Although the defendant in *Marinho* framed his argument in terms of the guarantees of the Sixth Amendment and art. 12, our decision did not make clear whether the holding was based solely on a defendant's rights under the Sixth Amendment, or also based on our interpretation of the defendant's rights under art. 12. We take the opportunity today to clarify that under art. 12 defense counsel must accurately advise a noncitizen client of the deportation consequences of a guilty plea or a conviction at trial.

For the same reasons that we determined that the Sixth Amendment right enunciated in *Padilla* was not a "new" rule, we conclude that the defendant's coextensive right under art. 12 does not constitute a "new" rule. Like *Strickland*, *supra* at 688,

our standard for ineffective assistance of counsel under *Saferian, supra* at 96, is a dynamic standard that evolves according to the advancement of professional norms. As we stated in *Marinho, supra* at 125, according to these norms, "the expectation in the Massachusetts legal community is that defense counsel should inform a client about immigration consequences associated with criminal conviction, however imposed." See Committee for Public Counsel Services, Assigned Counsel Manual Part IV, at 15 (rev. June 2011) ("Counsel must also advise the client . . . of the consequences of a conviction, including . . . deportation"); *Clarke, supra* at 43 n.15 ("since 1988, . . . all staff attorneys and bar advocates in Massachusetts [have been required] to advise a defendant client of the immigration consequences of his or her criminal case"). See also *Padilla, supra* at 1485 (for "at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea"). Finally, given the magnitude of the consequence to noncitizen defendants who plead guilty or are convicted at trial, tenets of fundamental fairness require that this right apply retroactively. *Commonwealth* v. *Amirault*, 424 Mass. 618, 639 (1997). Significantly, had we been presented with this issue at the time *Padilla* was decided, our conclusion that art. 12 provides such protection would have been the same.

For these reasons, the defendant is entitled to assert his claim for ineffective assistance of counsel under art. 12 on collateral review.

2. *Ineffective assistance of counsel.* We now proceed to the merits of the defendant's appeal. In order prevail on his claim for ineffective assistance of counsel, the defendant bears the burden of showing that (1) there has been "behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer" and (2) that "it has likely deprived the defendant of an otherwise available substantial ground of defence." *Saferian, supra.*

According to the defendant's counsel's affidavit, "I advised [the defendant] . . . that this disposition was not likely to result in his deportation because it was a conviction for straight [p]ossession with a sentence of under a year." That advice was plainly

incorrect. Pursuant to 8 U.S.C. § 1227(a)(2)(B)(i) (2006), "[a]ny alien who at any time after admission has been convicted of a violation of . . . any law or regulation of a State, . . . relating to a controlled substance . . . other than a single offense involving possession for one's own use of [thirty] grams or less of marijuana, is deportable." The defendant pleaded guilty to possession of cocaine (a class B substance) and, thus, was subject to deportation under 8 U.S.C. § 1227(a)(2)(B)(i). On its face, then, defense counsel's affidavit is sufficient to establish that he failed to provide the defendant with accurate advice concerning the deportation consequences of pleading guilty in violation of *Padilla, supra* at 369, thus satisfying the first prong of *Saferian.*

We are left to consider whether this deficient representation sufficiently prejudiced the defendant so as to justify vacating the defendant's guilty plea and ordering a new trial. "In the context of a guilty plea, in order to satisfy the 'prejudice' requirement, the defendant has the burden of establishing that (1) 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial,' " *Clarke, supra* at 47, quoting *Hill* v. *Lockhart,* 474 U.S. 52, 59 (1985); and (2) that "a decision to reject the plea bargain would have been rational under the circumstances." *Clarke, supra,* quoting *Padilla, supra* at 372. In this regard,

> "the defendant bears the substantial burden of showing that (1) he had an 'available, substantial ground of defence,' . . . that would have been pursued if he had been correctly advised of the dire immigration consequences attendant to accepting the plea bargain; (2) there is a reasonable probability that a different plea bargain (absent such consequences) could have been negotiated at the time; or (3) the presence of 'special circumstances' that support the conclusion that he placed, or would have placed, particular emphasis on immigration consequences in deciding whether to plead guilty." (Citations omitted.)

*Clarke, supra* at 47-48. With this requirement in mind, we turn to the record before us.

According to the defendant's affidavit submitted in support of his motion for new trial:

"When it came time to decide to go to trial or plead guilty, I remember being particularly wary of pleading guilty because I had previously been placed in removal proceedings for a drug offense. . . . I expressed my desire not to plead guilty to anything else that could make me deportable to my lawyer at the time . . . . [My attorney] told me that by keeping my sentence to under one year, I would avoid immigration consequences and would not be deportable. . . . Had I known then . . . that a conviction for possession of a class B substance is a deportable offense, regardless of the length of the sentence imposed, I would not have agreed to plead guilty to something that would surely result in my deportation . . . ."

Although the defendant's affidavit is highly suggestive that he would have elected to go to trial but for his attorney's erroneous advice, we do not have the benefit of any findings or credibility assessments made by the motion judge. Without the benefit of such findings, it is not possible for us to say with any certainty whether the defendant's affidavit is merely self-serving or whether he was sufficiently prejudiced to justify vacating his guilty plea and ordering a new trial. See *Saferian*, *supra* at 96 ("whatever the attempted formulation of a standard in general terms, what is required in the actual process of decision of claims of ineffective assistance of counsel . . . is a discerning examination and appraisal of the specific circumstances of the given case"). For this reason, we remand the case to the Boston Municipal Court with instructions to provide findings relating to the issue of prejudice and, if necessary, to hold an additional evidentiary hearing on the defendant's motion for new trial for that purpose.

*So ordered.*